UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

DALE W.                                     )
                                            )
            Plaintiff,                      )
                                            )
     vs.                                    )        Case No. 4:20 CV 398 JMB
                                            )
ANDREW M. SAUL,                             )
Commissioner of the Social                  )
Security Administration,                    )
                                            )
            Defendant.                      )

**MEMORANDUM AND ORDER**

This matter is before the Court for review of a partially favorable ruling by the Social Security Administration, issued after remand from this Court.  The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).

## I.  Procedural History

On March 31, 2014, plaintiff Dale W. filed applications for supplemental security income, Title XVI, 42 U.S.C. §§ 1381, *et* seq., and for a period of disability and disability insurance benefits, Title II, 42 U.S.C. §§ 401 *et seq*., with an alleged onset date of October 24, 2011.  (Tr. 150–53, 156–57, 714).  He subsequently amended his alleged onset date to July 14, 2013.  (Tr. 168).  Plaintiff's applications were denied on initial consideration (Tr. 77–87, 88–98), and he had a hearing before an Administrative Law Judge (ALJ) on April 21, 2016.  (Tr. 785–830).  The ALJ issued a decision denying plaintiff's applications on October 5, 2016.   (Tr. 842–61).  Plaintiff sought review before this Court and, on March 22, 2019, the matter was remanded for further consideration.[1]  (Tr. 868–80).

_____

[1] The Court found that the ALJ failed to resolve conflicts with the vocational expert's testimony.

On remand, the ALJ held hearings on September 4, 2019, and October 3, 2019, and received testimony from psychologist Jeffrey Andert, Ph.D., physician Nitin Paul Dhiman, M.D., and vocational expert Jennifer L. Ruhnke, M.A. (Tr. 2596–2618; 724–82). Although he attended the 2019 hearings with counsel, plaintiff did not testify. The ALJ issued a partially–favorable decision on December 11, 2019. (Tr. 698–714). With respect to plaintiff's application for a period of disability and disability insurance benefits, the ALJ found that plaintiff was not disabled through December 31, 2016, the date last insured, and that he retained the functional capacity to perform a range of simple light work. With respect to plaintiff's application for supplemental security income, the ALJ found that plaintiff was disabled beginning on July 2, 2018, due to a stroke. (Tr. 714). The ALJ's decision stands as the Commissioner's final decision.

## II.   Evidence Before the ALJ

Plaintiff, who was born in December 1965, was 47 years old on his amended alleged onset date. (Tr. 77, 88). He lived with his girlfriend in a mobile home. (Tr. 811). His two sons — ages 24 and 13 — did not live with him. (Tr. 809–10). He graduated from high school and attended a technical institute to learn auto repair. (Tr. 791–92). He worked in warehouses and regularly lifted 80 pounds. (Tr. 194–98). In 2011, he required shoulder surgery and was on leave for several months. On his return, he had an accident with a forklift and was let go. (Tr. 793–95). In 2013, he was in a motor vehicle accident that broke all the ribs on his left side, cracked his sternum, punctured his lung, and caused a muscle separation in one thigh. (Tr. 796).

### A.   Disability and Function Reports

#### 1.   2014 Disability and Function Reports

Plaintiff claimed he was disabled due to depression; pain in his back, shoulder, neck, and right leg; noncardiac chest pain; breathing restrictions; and short–term memory loss. (Tr. 171). In

2

his May 2014 Function Report (Tr. 183–93), plaintiff stated that he was unable to work because he could not walk or stand for long periods, lift and carry heavy objects, or lift "anything of weight" overhead.  (Tr. 183).  He used to be able to work, go to the zoo with his younger son, play ball, do yard work, play drums in a band, and complete simple repairs on his vehicle.  His daily activities consisted of fixing meals, showering, trying to do laundry, watching television, taking a walk outside, and going to the store if necessary.  Pain interfered with sleep, bathing, shaving, and dressing.  He was unable to do outside chores and could not walk more than two blocks before he needed to rest for 15 to 20 minutes.  He went shopping for under an hour about three times a month. He did not need reminders and managed financial accounts without difficulty.  He talked with friends and family on the phone and saw his sons regularly but did not go out much because he had difficulty walking or standing.  Plaintiff had difficulties with lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, climbing stairs, and memory.  He was able to attend, concentrate, and follow verbal and written instructions without difficulty.  He got along well with authority figures and had never lost a job because of problems getting along with others.  He managed changes in routine "okay," but not stress, and he experienced depression, crying spells, and "a lot of worries."  (Tr. 189).  He did not use any assistive devices and was not taking any medications.

### 2.    2018 Disability and Function Reports

In an updated Disability Report submitted on February 1, 2018 (Tr. 1047–57), plaintiff claimed he was disabled due to anxiety, "multiple degeneration consistent with arthritis," multiple levels of bulging discs, neuropathy, COPD, diabetes, depression, and ulcerative proctitis.  He had not worked since October 2011.  Plaintiff also filed an updated Function Report (Tr. 1058–69), in which he stated that he was unable to stand or walk for long periods and had balance issues due to

severe neuropathy in his feet and hands. He also had some weakness in one leg due to past trauma. He had limited movement of his arms due to shoulder injuries and limited movement of his head due to two neck surgeries. He prepared meals, did laundry, cleaned, and straightened up. He spent his time watching television. In nice weather, he sat on the deck and fed the birds and squirrels. He struggled to get comfortable enough to sleep and had difficulty with lifting, squatting, bending, standing, reaching, walking sitting, kneeling, climbing stairs, and completing tasks. He also had difficulty remembering spoken instructions and suffered from stress and anxiety. He was prescribed the muscle relaxant cyclobenzaprine, the antidepressant sertraline, the antihistamine hydroxyzine, and the nerve pain medication gabapentin. (Tr. 1068). In December 2018, plaintiff's medications included Canasa suppositories, injectable and oral medications to treat type–2 diabetes, cholesterol medication, the nonsteroidal anti-inflammatory meloxicam, an antihistamine, omeprazole to treat GERD, the narcotic oxycodone–acetaminophen, the antidepressant sertraline, inhalers, and the muscle relaxant tizanidine. (Tr. 1078–80). In July 2019, his medication list also included the antinausea drug ondansetron. (Tr. 1102–04).

### B. **Hearing Testimony**

#### 1. <u>Plaintiff's Testimony</u>

At the hearing in 2016, plaintiff testified that he had surgery in April 2011 on his left shoulder to repair a torn rotator cuff and three ruptured tendons. (Tr. 795–96). He returned to work after five months but then was let go after having an accident with his forklift. He was in the midst of interviewing for other jobs in July 2013, when the car he was driving was rear–ended and forced into a tree. He required hospitalization for a week to recover from broken ribs, a cracked sternum, and punctured lung. (Tr. 796). He also had some weakness in his left knee, especially when climbing stairs, which he attributed to knee surgery in 1983. (Tr. 797–98, 705).

He started using a cane in April 2015 after he experienced some falls due to neuropathy in his feet. (Tr. 817–18).  He had a cervical fusion in June 2015.[2]  (Tr. 808).  The fusion resolved several issues, including daytime numbness in his fingers, nighttime neck pain, and the pinching of a nerve when he washed his hair, but he still had pain and limited motion in his left shoulder.  (Tr. 815–16).   In November 2015, plaintiff began receiving treatment for hypertension, which was controlled by medication, and diabetes, which was improving but not fully controlled, and caused neuropathy in his hands and feet and blurred vision.  (Tr. 798–99).  Plaintiff also had COPD, for which he used an inhaler as needed, typically after exertion.  (Tr. 804–05).  He had migraines about once a month.  (Tr. 824).  Between 2013 and 2015, plaintiff's musculoskeletal conditions were treated solely with pain medications.  He disputed entries in the medical record stating that he declined recommended evaluations, treatments, and physical therapy.[3]  (Tr. 800–01).  In March 2016, an orthopedic surgeon injected both of plaintiff's shoulders, following which his sleep temporarily improved, but he was still unable to raise his arms above shoulder level.  (Tr. 801–04).

Plaintiff testified that he was primarily right–handed.  He had pain in his right shoulder and it occasionally "locked up" causing him to drop things.  (Tr. 813–14).  He also had occasional numbness and tingling in his hands, primarily when he woke up at night.  He had no difficulty with buttoning or zipping clothing or tying shoes.  He was able to stand to wash dishes or cook meals for 10 to 15 minutes before he needed to sit down.  He was unable to put the dishes away. He could vacuum and dust, but had trouble doing laundry because lifting wet clothes made his shoulders feel like they were "being ripped apart."  (Tr. 811).  He had limited movement in his

---

[2] This was his second cervical fusion.  In 2000, he had fusion at the C5 through C7 vertebrae.  (Tr. 590).

[3] In response to questions from counsel, plaintiff explained that until he received Medicaid in late 2015 he relied on providers who provided free treatment.  (Tr. 819–21).

neck, which in combination with pain in his back, legs, and shoulders, made it difficult to drive. He tried to complete his grocery shopping in 40 minutes, but experienced more pain the day after a shopping trip.  (Tr. 806, 827–28).  He sat to shower and could use only his right arm and hand to wash his hair.  He had difficulty putting on and taking off clothes that went on over his head. (Tr. 806–07).  He was unable to attend sports events because he could not stand in line, climb ramps or stairs, or sit in the seats.  (Tr. 810–11).  He was no longer able to play the drums or saxophone.

2.      Vocational Expert Testimony

In October 2019, vocational expert Jennifer Ruhnke was asked to testify about the employment opportunities for a hypothetical person of plaintiff's age, education, and work experience as a warehouse worker who was limited to light work who could frequently climb stairs and ramps, occasionally stoop, kneel, and crouch; frequently crawl; who was required to avoid concentrated exposure to environmental hazards and pulmonary irritants; who could handle and finger frequently; reach overhead occasionally and in other directions frequently; and who was limited to simple, routine, repetitive tasks in a low stress job.  Such an individual was unable to perform plaintiff's past relevant work but other work was available in the national economy, including folding machine operator, marker, and mail clerk.  (Tr. 766–68).  An individual who also required a sit–stand option could perform the work of a folding machine operator, office helper, and photocopy machine operator, but the numbers of jobs would be reduced.  (Tr. 771, 777–79).  Work would be precluded for an individual who needed to walk away from the work station for 5 minutes after an hour of sitting.  (Tr. 771).  Restricting the individual to occasional reaching in all directions eroded the job base, but there were limited numbers of jobs available as a school bus monitor, shipping receiver weigher, and bakery conveyor worker.  (Tr. 769).  An

6

individual who required a cane for standing or walking would not be able to perform these jobs. (Tr. 776–77).  Employers typically tolerated one unexcused absence a month, off–task behavior up to 10 % of the workday, and one unscheduled five–minute break in addition to the three breaks typically provided.  (Tr. 769–70).  Ms. Ruhnke stated that her testimony was consistent with the Dictionary of Occupational Titles (DOT), with the exception of information regarding overhead reaching, sitting, standing, changing positions, and absences and breaks, which was based on her professional education and experience.  (Tr. 782–83).

### C.   Medical Evidence[4]

Plaintiff's prior medical history includes a cervical fusion at C5-C6 and C6-C7 in 2000, arthroplasty of the left knee in 1983, and left rotator cuff surgery in 2011.  (Tr. 590, 351).  During the period under review, plaintiff was treated for uncontrolled diabetes,[5] gastritis and ulcerative

---

[4] Plaintiff argues that the ALJ improperly evaluated the opinions of treating physician Idelle Fraser, M.D., and consulting physician Dr. Dhiman, particularly with respect to limitations on plaintiff's capacity to reach, need for a cane, and unscheduled absences.  Although the Court has reviewed the entire medical record, the recitation of the medical evidence is tailored to addressing these specific issues.

[5] Plaintiff testified that he began treatment for diabetes in November 2015, but the record shows he was prescribed insulin as early as 2013.  (Tr. 798–99, 323).  Despite compliance with his medication regimen and multiple dosage changes, plaintiff's diabetes was never well–controlled.  (Tr. 336–38, 399–402, 1424–27, 1332–36, 1683–91).  In April 2016, plaintiff was hospitalized for an episode of diabetic ketoacidosis. (Tr. 1399–1413).

proctitis,[6] multiple musculoskeletal pains,[7] and diabetic changes to his feet.[8]  In April 2015, plaintiff was diagnosed with airway inflammation with a possible component of COPD and was prescribed an inhaler.  (Tr. 357–59).  Finally, as discussed more below, he had a second cervical fusion in 2015 and right shoulder surgery in 2016.[9]

Plaintiff alleges he became disabled on July 14, 2013, as the result of a car accident in which his vehicle was struck from behind and forced off the road into a tree.  (Tr. 262).  He was hospitalized for a week for treatment of multiple, minimally-displaced left-sided rib fractures, a small pneumothorax, and multiple soft tissue contusions to the chest and left flank.  (Tr. 262–96). A CT scan of the cervical spine showed the prior surgical fusion at C5 through C7, but no acute fracture or dislocation.  Plaintiff had moderate degenerative changes with varying degrees of spinal stenosis, most pronounced at C4–C5, which was the site of his second surgical fusion in 2015, as discussed below.  Plaintiff also had mild to moderate bilateral foraminal narrowing along the cervical spine.  (Tr. 277–78).  X–rays of the right knee showed mild arthritic changes without acute bone trauma.  (Tr. 271).  X–rays of the left shoulder showed mild to moderate arthritic changes to the left shoulder and possible mild traumatic deformity to the proximal left humerus.  (Tr. 269–

---

[6] Plaintiff first sought treatment for symptoms related to abdominal pain with nausea and diarrhea in April 2016 and was diagnosed with gastritis and ulcerative proctitis in June 2016.  (Tr. 1130, 1387–88).  In August 2017, plaintiff reported that he had diarrhea, nausea, and cramping 20 days of the month.  (Tr. 1321).  The most effective treatments were prescription medications that plaintiff frequently had trouble getting under his insurance.  (Tr. 2458, 1320–21).  In April 2018, plaintiff reported that medication controlled the pain associated with ulcerative proctitis and did not state whether the condition affected his ability to work.  (Tr. 1596).

[7] Plaintiff was treated for back pain for six months following the accident; his prognosis was described as guarded.  (Tr. 620–94).  Between September 2014 and May 2015, he received treatment for pain in his feet, neck, and shoulders through Volunteers in Medicine.  (Tr. 365–379).  Plaintiff's treatment for neck and shoulder pain are discussed further in the body of this memorandum.

[8] Plaintiff was diagnosed with diabetic polyneuropathy on March 22, 2017.  (Tr. 1286).

[9] The Court will not address the stroke plaintiff had in 2018, because the ALJ determined that he was disabled as of the date of the stroke.

70).  On August 15, 2013, plaintiff sought emergency treatment for swelling, numbness, and tingling in his right leg.  (Tr. 316).  He was diagnosed with a traumatic hematoma on the right thigh with swelling throughout the leg.  (Tr. 319).  He was prescribed Valium, gabapentin, and Percocet, in addition to diabetes medications.  (Tr. 323).

Plaintiff began complaining of pain and stiffness in his neck in August 2013, when it was noted that he had moderately reduced range of motion of the cervical spine and was prescribed Tramadol and cyclobenzaprine for pain.  (Tr. 331–33).  In May 2014, plaintiff had pain in his back, neck, and shoulder, which he rated at level 10 on a 10–point scale, and for which he was again prescribed Tramadol and cyclobenzaprine.  (Tr. 336–38).  An MRI of the cervical spine on November 19, 2014, showed straightening of the cervical lordosis, at least moderate central canal stenosis and significant bilateral foraminal stenosis at C4–C5, mild central canal stenosis and left foraminal stenosis at C3–C4, and postoperative fusion of C5–C7.  (Tr. 577–78).  X–rays of the cervical spine on January 30, 2015, showed straightening of the cervical lordosis, and decreased intervertebral space height at C4–C5.  (Tr. 580).

On June 29, 2015, neurosurgeon Stanley Martin, M.D., performed a C4–C5 anterior cervical microdiscectomy with fusion to address a juxta–fusional stenosis at C4–C5, with mild myelopathy and possible Lhermitte's phenomenon.[10]  (Tr. 589–94).  The preoperative notes report that plaintiff complained of neck pain that radiated into the interscapular area.  He had difficulty working overhead due to weakness and episodes of electric shock sensation in his legs and weakness in his right leg, which gave out occasionally.  On examination, plaintiff had good strength but was "quite slow" and had difficulty with tandem walking.  (Tr. 591).  At follow–up

---

[10] "Lhermitte's sign . . . is the name which describes an electric shock-like sensation that occurs on flexion of the neck. This sensation radiates down the spine, often into the legs, arms, and sometimes to the trunk." Lhermitte's sign (last visited on Feb. 18, 2021).

on October 29, 2015, plaintiff reported that he still had a stiff neck with interscapular pain, weakness in both hands, and little improvement in his walking.  (Tr. 385–92).  He was taking 3 Norco a day.   He complained of difficulty shaving due to decreased mobility in his cervical spine.  On examination, he had good strength and a normal gait.  He walked slowly in tandem but was fairly steady.  Dr. Martin assessed plaintiff as doing satisfactorily and asked him to return in a year for more imaging.  Plaintiff declined the offer of physical therapy at that time.  At follow–up in October 2016, plaintiff reported stiffness, interscapular pain, weakness and numbness in both hands, and little improvement in his walking.  Dr. Martin observed that he had a normal gait and was steady but walked slowly.  Imaging showed that plaintiff still had mild to moderate stenosis at C4–C5, less at C3–C4, and persistent encephalomalacia at C4–C5.[11]  (Tr. 1362–63).

Idelle Fraser, M.D., became plaintiff's primary care physician on November 18, 2015.  (Tr. 399–402).  Plaintiff reported that he had chronic pain in his neck, shoulder, and back, for which he had been taking Norco for about a year, and Dr. Fraser noted that plaintiff might benefit from pain management services and physical therapy.  Plaintiff stated that that he was compliant with his diabetes medication but did not monitor his blood sugar and so did not know whether his diabetes was controlled.  He also had stage 2 hypertension.  On examination, plaintiff was in no distress and was alert and oriented, with normal mood, affect, and judgment.  He had normal ranges of motion at the neck without tenderness.  Motor and sensory examinations were normal.  Dr.

---

[11] Encephalomalacia is the softening or loss of brain tissue after cerebral injury or trauma.  E. Karaman, et al., "Encephalomalacia in the Frontal Lobe: Complication of the Endoscopic Sinus Surgery "(Nov. 2011).  encephalomalacia (last visited Feb. 26, 2021).  By contrast, myelomalacia "is a descriptive term for changes seen . . . on MRI images which indicate a loss of spinal cord volume.  . . .  [T]here are a variety of disease processes which can cause this and it would generally be considered a significant finding, as the spinal cord does not repair itself readily, and therefore loss of spinal cord tissue is permanent."  myelomalacia-definition (last visited Feb. 26, 2021).  Given that Dr. Martin's finding was made in the context of a cervical MRI, it seems probable that the condition was myelomalacia, as was noted in a subsequent MRI on March 25, 2016.  (See also Tr. at 765) (Dr. Dhiman testified that plaintiff had myelomalacia).

Fraser refilled his prescriptions for Norco, insulin, cholesterol medication, and Spiriva inhaler. (Tr. 406–07).  At follow up in December 2015, plaintiff's hypertension had improved with medication.   (Tr. 433–38).   Dr. Fraser continued plaintiff's existing medications, added prescriptions for albuterol for COPD and Chantix to help plaintiff quit smoking, and increased his insulin intake. (Tr. 427, 437).  His physical examination was again unremarkable.  On January 19, 2016, Dr. Fraser noted that plaintiff had reduced his smoking.  She continued his pain medication, again increased his insulin intake, and referred him to an endocrinologist.  (Tr. 490, 495–98).  On February 1, 2016, endocrinologist Vijaya Vasudevan, M.D., increased plaintiff's diabetes medications and directed him to lose weight.  (Tr. 1424–27).  On March 1, 2016, Dr. Fraser noted that plaintiff had bilateral ankle pain and was using a cane.  She referred plaintiff to physical therapy and a weight–loss clinic.  A diabetic foot exam was normal.  (Tr. 530–34).

Dr. Fraser ordered MRIs of plaintiff's cervical, thoracic, and lumbar spine, which were completed on March 25, 2016.  (Tr. 568–72).  The cervical spine MRI showed moderate bilateral foramina narrowing at C2–C3, moderate to severe foraminal stenosis and central canal narrowing at C3–C4 and C4–C5, and indications of myelomalacia and gliosis at C4–C5.[12]  The thoracic spine MRI showed mild disc desiccation of the mid–thoracic intervertebral spaces and Schmorl nodes[13] from T5 to T10 vertebra, small perineural cysts[14] at several levels, and some disc profusions and

---

[12] Gliosis "is a process leading to scars in the central nervous system that involves the production of a dense fibrous network of neuroglia (supporting cells) in areas of damage."  gliosis-definition (last visited on Feb. 19, 2021).

[13] "Schmorl nodes, also referred as intravertebral disc herniations, refer to protrusions of the cartilage of the intervertebral disc through the vertebral body endplate and into the adjacent vertebra. The protrusions may contact the marrow of the vertebra, leading to inflammation."  schmorl-nodes-definition (last visited on Feb. 19, 2021).

[14] Perineural cysts are fluid-filled sacs that form on the nerve root sheath in the spine.  They almost never cause symptoms but when they do the most common is pain in the lower back, buttocks, or legs.  This

ligamentum infolding[15] without definite central canal narrowing or foraminal stenosis.  The lumbar spine MRI showed mild foraminal narrowing and moderate flattening of the thecal sac at L3–L4 and L4–L5, narrowing of the lateral recess at L3–L4, and disc bulge and protrusion at L5–S1 with mild to moderate foraminal stenosis without central canal narrowing.  After reviewing the results with Dr. Fraser, plaintiff agreed to a referral to pain management services.  (Tr. 560).  With the exception of a medical source statement completed on March 24, 2016 (see below), there are no further records from Dr. Fraser, although she continued to be identified as his primary care provider.  (Tr. 1684).

On March 30, 2016, orthopedic surgeon Cody Bellard, M.D., evaluated plaintiff for complaints of bilateral shoulder pain.  (Tr. 604–07).  Plaintiff reported that he had pain when trying to lift his arm above shoulder level, weakness, and difficulty reaching behind his back.  His left shoulder hurt more than his right.  On examination, plaintiff had bilateral tenderness to palpation, with crepitus on movement of the left arm.  He had decreased range of movement on external rotation in both shoulders and decreased range on internal rotation of the right shoulder.  He had atrophy in the muscles of the left rotator cuff.  He had mixed results on tests of shoulder impingement[16] and there were indications of torn cartilage in both shoulders and pathology of the

---

occurs when the cysts become enlarged with spinal fluid and press on nerves.  perineural-cysts-definition (last visited on Feb. 19, 2021).

[15] The ligamenta flavum is a ligament that connects the laminae of adjacent vertebrae from C2 to S1. ligamentum-flavum-definition

[16] Plaintiff's results on the Neer and Hawkins tests were positive on both sides, and cross–body tests were positive on the left and negative on the right.

bicep in the left shoulder.[17]  Radiographic studies showed type–2 acromia in both shoulders,[18] and osteophytes at the humeral head and superior humeral migration in the left shoulder.[19]  Dr. Bellard assessed plaintiff with osteoarthritis and incompetent rotator cuff on the left side and injected plaintiff's shoulders with a mixture of the steroid Kenalog and the anesthetic Marcaine.

An MRI of plaintiff's right shoulder completed on June 3, 2016, showed tears in the supraspinatus tendon, including a small full tear and a moderate partial tear; a moderate partial tear of the infraspinatus tendon; fatty atrophy of the muscle bellies; and severe degenerative change of the acromioclavicular joint with moderate bony hypertrophy.  (Tr. 1169).  Plaintiff underwent bilateral shoulder injections on June 22, 2016.  (Tr. 1384–87).  On August 2, 2016, Dr. Bellard performed surgery on plaintiff's right shoulder, completing arthroscopy with extensive debridement, subscapularis repair, biceps tenodesis,[20] rotator cuff repair, and subacromial decompression.  (Tr. 1181–84).  At follow–up on August 15, 2016, plaintiff reported continued pain in the right shoulder.[21]  (Tr. 1371–73).  On September 26, 2016, plaintiff rated his pain at

---

[17] Plaintiff had bilateral positive results on the O'Brien's test and positive results on the right side on the Speed's test.

[18] Three different shapes of the acromion — an extension of the shoulder blade — are recognized.  Type I is flat, Type II is curved, and Type III is hooked.  People with Type II or III acromia are at greater risk of impingement.  acromion (last visited on Feb. 19, 2021),.

[19] Superior migration of the shoulder describes the condition in which the humeral head, or ball, has migrated upward out of the center of the socket.  This "somewhat rare condition" can occur in patients with large rotator cuff tears where one or more of the tendons are completely missing.  Sometimes patients in this group have had an operation to repair the tendons but the repair has failed.  superior-migration-of-shoulder  (last visited Feb. 19, 2021).

[20] Bicep tenodesis is a procedure to repair a tear in the tendon that connects the bicep muscle to the shoulder.  During the surgery, a screw is inserted into the upper part of the humerus.  The tendon is then detached from the glenoid and attached to the screw.  See biceps-tenodesis (last visited on Feb. 19, 2021).

[21] Plaintiff had thirteen session of physical therapy between September 7 and December 19, 2016.  (Tr. 1196–1239).  At the outset, he reported that he had been having trouble sleeping and completing daily–living activities with his left hand.  He rated his pain at level 8 on a 10–point scale.  He demonstrated

level 7 and Dr. Bellard noted the need to get more aggressive with restoring his range of motion. (Tr. 1366–68).  On examination, plaintiff had very limited range of motion with pain and palpable scar tissue.  In November 2016, plaintiff's range of motion had improved but he continued to experience pain with motion.  Dr. Bellard injected plaintiff's right shoulder.  (Tr. 1356–59).  In December 2016, plaintiff reported that the injection helped but he had overused his shoulder while working on his truck and had increased pain and arthrofibrosis.[22]  Dr. Bellard noted continued improvement in range of motion and function, describing it as "not perfect" and "a work in progress."  (Tr. 1354–56).  On January 23, 2017, Dr. Bellard noted continued pain and decreased range of motion and strength in the right shoulder.  (Tr. 1351–53).  An MRI of the right shoulder showed osteoarthritis and that the rotator cuff repair was intact.  On examination in March 2017, plaintiff had increased range of motion and full strength.  He had no pain with range of motion below the shoulder level.  Dr. Bellard injected plaintiff's shoulder.  (Tr. 1344–46).  Plaintiff reported in April 2017 that the injection did help, but he still had pain that he rated at level 8, which Dr. Bellard attributed to his biceps tenodesis and injected the biceps groove.  (Tr. 1337–39).  In May 2017, plaintiff reported that he had played drums and mowed his lawn but had pain when trying to elevate his shoulder.  On examination he had exquisite tenderness on palpation.  Dr. Bellard provided a soft tissue injection of the painful area and directed plaintiff to perform

---

reduced passive range of motion and muscle guarding in his right upper extremity.  On December 19th, the physical therapist noted that plaintiff had been making good progress, with improvement in his active and passive ranges of motion, strength, and function.  He was expected to continue but missed his appointment on December 28, 2016, and there is no indication whether he kept the appointment scheduled for January 4, 2017.  (Tr. 1244).

[22] "Arthrofibrosis is a fibrotic joint disorder that begins with an inflammatory reaction to insults such as injury, surgery and infection. Excessive extracellular matrix and adhesions contract pouches, bursae and tendons, cause pain and prevent a normal range of joint motion, with devastating consequences for patient quality of life."  K.M. Usher, et al. "Pathological mechanisms and Therapeutic Outlooks for Arthrofibrosis" (Mar. 2019).  arthrofibrobis  (last visited on Feb. 22, 2021).

activities as tolerated.  (Tr. 1329–32).  In June 2017, plaintiff reported continued pain and stiffness, especially with increased use of the shoulder.  Dr. Bellard opined that plaintiff's overall function and pain level, although not perfect, were better than they had been before surgery.  (Tr. 1326–29).

In October 2017, Dr. Bellard evaluated plaintiff's left shoulder for pain and crepitus with motion.  (Tr. 1313–15).  X–rays showed arthritis of the glenerohumeral joint, which Dr. Bellard injected.  He also prescribed Flexeril for muscle spasms in the upper arm.  Plaintiff underwent bilateral shoulder injections in June 2018.  (Tr. 2500–05).  In February 2019, plaintiff returned for injection of his left shoulder, which he reported had done well until January 2019.  His right shoulder was doing well.  (Tr. 2519).

On January 16, 2018, plaintiff was evaluated by pain management specialist Christopher Patton, M.D., on referral from primary care physician Dr. Fraser.  (Tr. 1288–95).  Plaintiff complained of neck pain that radiated into both shoulders and down his back and pain in his right inner thigh.  He had numbness and tingling in his hands and feet and weakness in his back and arms.   He reported having poor sleep, COPD, coughing, dyspnea on exertion, chronic gastrointestinal pain, depression, anxiety, and headaches.[23]   On examination, plaintiff had decreased ranges of motion at the neck, lumbar spine, and shoulders, a positive Spurling's test,[24] and tenderness to palpation.  Sensation was intact to light touch.   Plaintiff was diagnosed with failed neck syndrome, long–term use of medication, diabetic peripheral neuropathy, chronic pain

---

[23] The review of systems section also states that plaintiff denied diabetes, joint pain, and osteoarthritis, even those these conditions are listed elsewhere in the progress note.

[24] The Spurling's test is used to detect cervical radiculopathy.  Spurling test (last visited Mar. 1, 2021).

in both shoulders, and myofascial pain.  Plaintiff was prescribed gabapentin, with cervical epidural steroid injections to be considered once his diabetes was under better control.

Martin Schoen, M.D., completed a consultative evaluation of plaintiff in April 2018.[25]  (Tr. 1596–1600).  Plaintiff reported he had COPD and experienced shortness of breath with exertion and fatigue; arthritis which caused pain ranging between levels 8 and 10; back pain which affected his ability to sit, stand, walk, or engage in any activity; ulcerative proctitis; depression, anxiety, and post–traumatic stress disorder which decreased his motivation, impaired his concentration, and caused fatigue; and diabetes with neuropathy, weakness, and balance problems.  On examination, he appeared older than his stated age.  He had a slow, steady gait, and was able to walk on his heels and toes only with great difficulty.  He had moderate difficulty rising from a squat and some difficulty getting on and off the examination table.  He used a cane to ambulate, which had not been prescribed but improved his gait and appeared to be medically necessary.  He had decreased sensation in both lower legs and positive straight–leg raising, but no evidence of weakness in his legs or radicular symptoms.  He had normal respiratory signs.  Plaintiff's ulcerative proctitis caused pain but plaintiff did not state whether it affected his ability to work.  In evaluation of plaintiff's fine and gross manipulative abilities, Dr. Schoen noted that plaintiff was able to open a door using a knob, squeeze, pick up and hold a cup, and pick up a pen with either hand without difficulty.  He had mild difficulty picking up a coin with his left hand, and mild difficulty with buttons and zippers with either hand, and moderate difficulty tying shoelaces.  He had full grip strength.  (Tr. 1601).  He had significantly reduced ranges of motion in flexion and abduction of both shoulders; and slightly reduced ranges of motion in his elbows, wrists, hips, ankles, cervical spine, and lumbar spine.  (Tr. 1602–03).

---

[25] Dr. Schoen indicates that he reviewed a medical record note from April 2016.

D.      **Opinion Evidence**

Plaintiff underwent a consultative examination with neurosurgeon Dennis Velez, M.D., on July 18, 2014, for evaluation of depression, left shoulder pain, back pain, neck pain, right leg pain, noncardiac chest pain and breathing problems, and short–term memory loss.  (Tr. 346–56). He reported that he had headaches, lightheadedness, vision changes, limited ranges of motion, cramps, leg pain when walking, shortness of breath, cough, heartburn, memory problems, and emotional problems.  He reported that he could sit for 60 minutes, stand for 30 minutes, and walk one and a half blocks.  He could lift and carry up to 20 pounds.  On examination, he was alert, fully oriented, in no acute distress, and did not have any assistive devices.  Examination of his neck, cardiovascular system, lungs, abdomen, extremities, and cranial nerves disclosed no abnormalities.  He had a normal gait and stance and signs of cerebellar dysfunction were negative. He had full motor strength without atrophy, fasciculations, rigidity, or tremor.  Sensation and reflexes were intact and straight–leg raising was negative.  He had tenderness to palpation in both knees with unlimited ranges of motion.  He had tenderness over the acromioclavicular joint of the left shoulder with slight atrophy of the musculature but normal range of motion.  Tests of impingement and rotator cuff tears were negative.  He had tenderness to palpation of the right deltoid and lumbosacral spine.  He could tandem– and heel–toe walk, squat and rise from a squat without difficulty, put his arms above his head, make a fist, and fully extend his fingers.  There was no sign of ruptured knee ligaments.  A mental status examination was unremarkable.  Plaintiff was diagnosed with history of depression, possible left shoulder sprain, and lumbago with normal neurological examination.  Dr. Velez opined that plaintiff would have no limits on sitting, standing, walking, lifting or carrying, manipulation, or communication.   The ALJ did not find this opinion

persuasive because it did not incorporate limitations from plaintiff's "back condition in relation to his prior surgeries."  (Tr. 711).  Plaintiff does not challenge the ALJ's assessment of this opinion.

On April 24, 2016, primary care physician Idelle Fraser completed a Physical Residual Functional Capacity Questionnaire.  (Tr. 380–83).  Dr. Fraser listed plaintiff's diagnoses and symptoms as chronic neck, shoulder, and back pain, and assessed his prognosis as "fair."  She did not characterize the nature and severity of his pain, as requested.  In response to a question asking her to identify the clinical findings and objective signs, she merely repeated that plaintiff had "pain in shoulders, neck [and] back" and "decreased range of motion."  His treatment had consisted of cervical fusion and chronic narcotic use.  She did not identify any medication side effects that would effect his ability to work.  She opined that plaintiff would frequently experience pain or other symptoms that would interfere with the attention and concentration necessary to perform simple work tasks.  He was unable to walk any distance without pain or the need to rest; could sit 90 minutes at a time; stand 5 minutes at a time; stand or walk less than 2 hours in an 8–hour day; could never lift more than 10 pounds; could rarely look up or down, turn his head, or hold his head in a static position; and had limitations on reaching, handling, and fingering.  He needed to use a cane; needed an allowance for 1 or 2 unscheduled breaks, each lasting 30 minutes; and would miss 4 days of work per month.  The ALJ found Dr. Fraser's opinion unpersuasive because "the signs throughout [plaintiff's] treatment records do not show this level of limitation."  (Tr. 711).  In particular, Dr. Fraser's examination notes recorded that plaintiff had normal ranges of motion and sensory function and no focal deficits.  Plaintiff argues that the ALJ incorrectly rejected Dr. Fraser's opinion because it is supported by objective findings elsewhere in the record.

Psychologist Jeffrey N. Andert, Ph.D., testified in September 2019 regarding plaintiff's mental impairments.  Based on a review of the medical records, Dr. Andert opined that plaintiff

had the severe impairments of depressive disorder and unspecified anxiety disorder, but his impairments did not meet or equal a listing.  (Tr. 2602–05).  He had no documented cognitive deficits but did have subjective complaints of short–term memory deficits.  With respect to the Category B criteria, Dr. Andert opined that plaintiff was mildly restricted in the areas of understanding, remembering, and applying information; social functioning; and the ability to adapt and manage himself; and moderately restricted in the area of concentration, persistence, and pace.  (Tr. 2606–07).  Based on the severity of his depression and anxiety, plaintiff would be "limited to simple work which could include up to three steps that involve judgment in each step toward completion of a finished product."  (Tr. 2605).  He would be precluded from fast–paced work such as an assembly line.  He did not have any restrictions in his ability to work with others and would not require additional supervision or breaks to perform simple work.  The ALJ found Dr. Andert's opinion persuasive, a finding that plaintiff does not challenge.  (Tr. 771).

The ALJ received testimony from physician Nitin Paul Dhiman, M.D.  (Tr. 724–66).  Based on a review of the medical record, Dr. Dhiman found that plaintiff had the medically–determinable impairments of degenerative disc disease of the cervical and lumbar spine, diabetic neuropathy, diabetes mellitus, hypertension, history of a stroke in July 2018, and inflammatory bowel disease.  (Tr. 731, 732, 738).  An angiogram following plaintiff's stroke established that he had chronic vertebral vascular insufficiency[26] and chronic ischemia.  (Tr. 736).  Dr. Dhiman opined that, as of July 24, 2019, plaintiff's impairments met listing 1.04A, disorders of the spine.  In support, he cited an MRI of the lumbar spine completed on July 24, 2019, showing moderate spondylosis at L4–L5 and L5–S1, mild–to–moderate central stenosis at L3–L4, mild central stenosis and mild

---

[26] Vertebrobasilar insufficiency is a condition characterized by poor blood flow to the posterior (back) portion of the brain, which is fed by two vertebral arteries that join to become the basilar artery.  See vertebrobasilar insufficiency -UC Davis

bilateral neuroforaminal stenosis at L4–L5, and an extrusion at L5–S1 that abutted the S1 nerve with moderate bilateral neuroforaminal stenosis.  (Tr. 1967–68).  In addition, plaintiff's impairments equaled listing 11.04B, vascular insult to the brain, following his stroke.  (Tr. 740–43).  In support he cited the findings of an examination on August 30, 2019.  (Tr. 2585–86).  Plaintiff's diabetes was uncontrolled and his functioning was probably impaired by pain due to diabetic neuropathy.  (Tr. 743–45).

As relevant to the issues before the Court, Dr. Dhiman opined that, before his stroke, plaintiff had the residual functional capacity to lift and carry up to 20 pounds occasionally and up to 10 pounds frequently; to sit for six hours and to stand and/or walk for six hours in an 8–hour workday; to reach in all directions occasionally; and to handle and finger frequently.  There were no limitations on using foot controls.  Plaintiff was able to frequently climb ramps and stairs; never climb ladders, ropes or scaffolds; balance without restriction; stoop, kneel, and crouch occasionally; and crawl frequently.  When asked whether his finding with respect to crawling conflicted with his finding on reaching, Dr. Dhiman explained that reaching used only the shoulder, while crawling used the legs, knees, and shoulders.  (Tr. 750–58).  With respect to plaintiff's right shoulder, Dr. Dhiman testified that his opinion that plaintiff was limited to occasional reaching was supported by examination findings in October 2017.  (Tr. 763–64).  Dr. Dhiman also testified that, while no medical provider prescribed a cane for plaintiff's use, he found "plausible" the 2018 opinion of the consultative examiner that the cane was medically necessary to improve plaintiff's gait.  (Tr. 764–65).  Finally, Dr. Dhiman stated that before his stroke plaintiff possibly would have missed work two or three days a month.  (Tr. 765).

The ALJ found that Dr. Dhiman's assessment of plaintiff's residual functional capacity was inconsistent with his opinion that plaintiff met Listing 1.04A.  (Tr. 610).  In addition, the ALJ

did "not agree that occasional limits on reaching is consistent with frequent crawling," which is "more physically demanding than reaching" because it "requires some weight–bearing and hence, increased stress on the shoulder as compared to reaching." (Tr. 710). Plaintiff asserts that the ALJ improperly substituted his opinion for that of the medical expert.

### III.  Standard of Review and Legal Framework

To be eligible for disability benefits, plaintiff must prove that he is disabled under the Act. See Baker v. Sec'y of Health & Human Servs., 955 F.2d 552, 555 (8th Cir. 1992); Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001). The Act defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) and 1382c (a)(3)(A). A claimant will be found to have a disability "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B). See also Bowen v. Yuckert, 482 U.S. 137, 140 (1987).

The Social Security Administration has established a five-step process for determining whether a person is disabled. See 20 C.F.R. § 404.1520; Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009). Steps one through three require the claimant to prove (1) he is not currently engaged in substantial gainful activity, (2) he suffers from a severe impairment, and (3) his disability meets or equals a listed impairment. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009); see also Bowen, 482 U.S. at 140-42 (explaining the five-step process). If the claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five. Pate-Fires, 564

F.3d at 942.  "Prior to step four, the ALJ must assess the claimant's residual functional capacity (RFC), which is the most a claimant can do despite [his] limitations." Moore, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)).  At step four, the ALJ determines whether claimant can return to his past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past."  20 C.F.R. § 404.1520(e).  The burden at step four remains with the claimant to prove his RFC and establish that he cannot return to his past relevant work.  Moore, 572 F.3d at 523; accord Dukes v. Barnhart, 436 F.3d 923, 928 (8th Cir. 2006); Vandenboom v. Barnhart, 421 F.3d 745, 750 (8th Cir. 2005).  If the ALJ holds at step four that a claimant cannot return to past relevant work, the burden shifts at step five to the Administration to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy.  Banks v. Massanari, 258 F.3d 820, 824 (8th Cir. 2001); see also 20 C.F.R. § 404.1520(f).

The Court's role on judicial review is to determine whether the ALJ's finding are supported by substantial evidence in the record as a whole.  Pate-Fires, 564 F.3d at 942.  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019).  "[T]he threshold for such evidentiary sufficiency is not high."  Id.  Stated another way, substantial evidence is "less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision."  Juszczyk v. Astrue, 542 F.3d 626, 631 (8th Cir. 2008); see also Wildman v. Astrue, 964 F.3d 959, 965 (8th Cir. 2010) (same).  In determining whether the evidence is substantial, the Court considers evidence that both supports and detracts from the ALJ's decision.  Cox v. Astrue, 495 F.3d 614, 617 (8th Cir. 2007).

The Eighth Circuit has repeatedly emphasized that a district court's review of an ALJ's disability determination is intended to be narrow and that courts should "defer heavily to the findings and conclusions of the Social Security Administration." Hurd v. Astrue, 621 F.3d 734, 738 (8th Cir. 2010) (quoting Howard v. Massanari, 255 F.3d 577, 581 (8th Cir. 2001)).  Despite this deferential stance, a district court's review must be "more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision." Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).  The district court must "also take into account whatever in the record fairly detracts from that decision." Id.; see also Stewart v. Sec'y of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (setting forth factors the court must consider).  Finally, a reviewing court should not disturb the ALJ's decision unless it falls outside the available "zone of choice" defined by the evidence of record. Buckner v. Astrue, 646 F.3d 549, 556 (8th Cir. 2011).  A decision does not fall outside that zone simply because the reviewing court might have reached a different conclusion had it been the finder of fact in the first instance. Id.; see also McNamara v. Astrue, 590 F.3d 607, 610 (8th Cir. 2010) (explaining that if substantial evidence supports the Commissioner's decision, the court "may not reverse, even if inconsistent conclusions may be drawn from the evidence, and [the court] may have reached a different outcome").

## IV.  The ALJ's Decision

The ALJ's decision in this matter conforms to the five-step process outlined above. (Tr. 699–714).  The ALJ found that plaintiff met the insured status requirements through December 31, 2016, and had not engaged in substantial gainful activity since July 14, 2013, the amended alleged onset date. (Tr. 701–02).  At step two, the ALJ found that plaintiff had the severe impairments of degenerative disc disease, type II diabetes mellitus with neuropathy, history of

asthma, status–post spinal fusion, status–post shoulder surgery, anxiety, and depression.   In

addition, beginning on July 2, 2018, plaintiff had the additional disabling severe impairment of a

cerebrovascular accident. (Tr. 702).  The ALJ concluded that plaintiff's abdominal bloating, rectal

bleeding, and hypertension did not cause more than minimal impact on work–related functioning.

With respect to plaintiff's ulcerative proctitis, the ALJ noted that it was diagnosed in June 2016,

poorly controlled in August 2017, and controlled by medication in 2018.  Id.  The ALJ determined

at step three that, prior to July 2, 2018, plaintiff did not have an impairment or combination of

impairments that met or medically equaled the severity of a listed impairment, including listings

1.04 (disorders of the spine), 1.02 (major dysfunction of a joint), 3.03 (asthma), 12.04 (depressive,

bipolar and related disorders), or 12.06 (anxiety and obsessive–compulsive disorders).  (Tr. 14).

The ALJ next determined that, before July 2, 2018, plaintiff had the RFC to perform light

work, except that he could never climb ladders, ropes, or scaffolds; frequently climb ramps and

stairs; occasionally stoop, kneel, and crouch; frequently crawl; frequently handle and finger;

occasionally reach overhead; and frequently reach in all other directions.   He had to avoid

concentrated exposure to environmental hazards; avoid all exposure to moving machinery and

unprotected heights.   In addition, he was limited to simple, routine, and repetitive tasks in a low

stress job with occasional simple work–related decisions and few workplace changes, and no pace

production quotas.  (Tr. 704–11).  In assessing plaintiff's RFC, the ALJ summarized the medical

record; opinion evidence; and plaintiff's written reports and testimony regarding his abilities,

conditions, and activities of daily living.  While the ALJ found that plaintiff's severe impairments

could reasonably be expected to produce some of the alleged symptoms, the ALJ also determined

that plaintiff's statements regarding the intensity, persistence, and limiting effect of his symptoms

were "not entirely consistent with" the medical and other evidence.  (Tr. 706).

At step four, the ALJ concluded that plaintiff was unable to perform his past relevant work. (Tr. 711).  The ALJ also determined that, beginning on July 2, 2018, the severity of plaintiff's impairments medically equaled the criteria of listing 11.04B, vascular insult to the brain.  (Tr. 713).  Prior to the established disability date of July 2, 2018, plaintiff was a younger individual. He had at least a high–school education and was able to communicate in English.  (Tr. 711–12). Prior to July 2, 2018, the transferability of job skills was not an issue because using the Medical-Vocational Rules as a framework supported a finding that plaintiff was not disabled whether or not he had transferable skills.  The ALJ found at step five that, prior to July 2, 2018, someone with plaintiff's age, education, work experience, and residual functional capacity could perform other work that existed in significant numbers in the national economy, including folding machine operator, marker, and mail clerk.  (Tr. 712).  Thus, the ALJ found that plaintiff was not disabled within the meaning of the Social Security Act prior to July 2, 2018.  (Tr. 713).

## V.  Discussion

Plaintiff argues that the ALJ: (1)  improperly evaluated the opinions of consulting physician Dr. Dhiman and primary care physician Dr. Fraser; (2) made an incomplete credibility analysis; and (3) failed to properly support the RFC determination.  Because the Court finds that this matter must be remanded for reconsideration of the opinion evidence, points 2 and 3 will not be addressed.

When evaluating opinion evidence, an ALJ is required to explain in the decision the weight given to any opinions from treating sources, non-treating sources, and non-examining sources.  See 20 C.F.R. § 404.1527(e)(2)(ii).  The regulations require that more weight be given to the opinions of treating physicians than other sources.[27]  20 C.F.R. § 404.1527(c)(2).  Similarly, more weight

---

[27]This continues to be true for plaintiff's claim because it was filed before March 27, 2017.  Combs v. Berryhill, 868 F.3d 704, 709 (8th Cir. 2017); 20 C.F.R. § 404.1527 ("For claims filed . . . before March 27, 2017, the rules in this section apply."); § 404.1527(c)(1) ("Generally, we give more weight to the medical

is given to examining sources than to nonexamining sources.  20 C.F.R. § 404.1572(c)(1).  "A treating physician's opinion should be granted controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record."  Nowling v. Colvin, 813 F.3d 1110, 1122 (8th Cir. 2016) (internal quotation and citations omitted).  A treating physician's opinion, however, "does not automatically control or obviate the need to evaluate the record as a whole."  Id. at 1122-23 (citation omitted).  Rather, "an ALJ may discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions."  Id. (citation omitted).

Where the ALJ does not give a treating physician's opinion controlling weight, the ALJ must evaluate the opinion based on several factors, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, the evidence provided by the source in support of the opinion, the consistency of the opinion with the record as a whole, and the level of specialization of the source. 20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6).  And, the ALJ must give "good reasons" for discounting a treating physician's opinion.  See Davidson v. Astrue, 501 F.3d 987, 990 (8th Cir. 2007) (internal quotation marks omitted); see also 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2) ("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's medical opinion.").  The failure to give good reasons for discrediting a treating physician's opinion is a ground for remand.  Snider v. Saul, No. 4:18-CV-1948-SPM, 2020 WL 905851, at *4 (E.D.

---

opinion of a source who has examined you than to the medical opinion of a medical source who has not examined you.").

26

Mo. Feb. 25, 2020) (citing <u>Anderson v. Barnhart</u>, 312 F. Supp. 2d 1187, 1194 (E.D. Mo. 2004) ("Failure to provide good reasons for discrediting a treating physician's opinion is a ground for remand."); <u>Clover v. Astrue</u>, No. 4:07CV574–DJS, 2008 WL 3890497, at *12 (E.D. Mo. Aug. 19, 2008) ("Confronted with a decision that fails to provide 'good reasons' for the weight assigned to a treating physician's opinion, the district court must remand.")).

In formulating plaintiff's RFC before his stroke in July 2018, Dr. Dhiman testified, as relevant here, that plaintiff was limited to occasional reaching. (Tr. 753–55). In support, he cited plaintiff's well–documented history of cervical fusion, decreased strength, reduced ranges of motion, crepitus, spasms, osteoarthritis, muscle atrophy, and ongoing pain. (Tr. 753–55, 763). The ALJ rejected this reaching limitation as inconsistent with two other elements of Dr. Dhiman's opinion. First, the ALJ stated, Dr. Dhiman testified that plaintiff met the criteria for listing 1.04A as of the amended onset date, July 14, 2013. (Tr. 702). The ALJ then found that Dr. Dhiman's RFC assessment was inconsistent with the opinion that plaintiff met listing 1.04A. (Tr. 710). In fact, Dr. Dhiman actually testified that plaintiff satisfied the listing as of July 24, 2019 — well after the date that the ALJ determined plaintiff was disabled — and cited an MRI taken on that date to support his conclusion. (Tr. 739–40, 1967–68). Thus, the ALJ erred in relying on Dr. Dhiman's testimony regarding listing 1.04A to discount the reaching limitation.

The ALJ also found that Dr. Dhiman's limitation to occasional reaching was inconsistent with his opinion that plaintiff could frequently crawl. Plaintiff argues that the ALJ improperly substituted his medical opinion for that of a physician. The Court disagrees. The ALJ cited "Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational

Titles,"[28] Appendix C, Physical Demands, 1(b), 7 and 8 (defining reaching and crawling).  This Department of Labor document, which defines the physical demands of selected occupations, shows that crawling is generally more restricted than is reaching.  Thus, the ALJ did not improperly "play doctor," as plaintiff asserts, in concluding that Dr. Dhiman's testimony contained a contradiction.  It is not clear, however, that the ALJ properly resolved that contradiction by rejecting the limitation on reaching, particularly in light of the objective evidence Dr. Dhiman cited to support that limitation.  It is possible that the ALJ's assessment on this point was influenced by the error discussed above.  Accordingly, the Court finds that this matter must be remanded for further consideration of Dr. Dhiman's opinion.

Dr. Fraser opined that plaintiff was unable to walk any distance without pain or the need to rest; could sit 90 minutes at a time; stand 5 minutes at a time; stand or walk less than 2 hours in an 8–hour day; could never lift more than 10 pounds; could rarely look up or down, turn his head, or hold his head in a static position; and had limitations on reaching, handling, and fingering.  In addition, she stated, plaintiff needed to use a cane; needed an allowance for 1 or 2 unscheduled breaks during the work day, each lasting 30 minutes; and would miss 4 days of work per month.  The ALJ correctly noted that these limitations were not reflected in Dr. Fraser's examination findings.  Furthermore, she failed to support her opinion with citations to objective evidence, despite being asked to do so.  Plaintiff argues that Dr. Fraser's opinion is supported by other objective evidence in the record, including MRI findings and examinations by Drs. Bellard and Martin.  In addition, plaintiff argues, Dr. Fraser's opinion is entirely consistent with plaintiff's

---

[28] The ALJ actually cited "Selected Characteristics for Occupational Exploration," which the Court was not able to locate.  The document cited above includes the definitions the ALJ relied on.  See PDF found at SelectedCharacteristics

subjective complaints.  Because this matter will be remanded for reevaluation of Dr. Dhiman's opinion, it may be appropriate to ask Dr. Fraser to supplement her medical source statement.

Finally, plaintiff argues that the ALJ failed to address the impact of his use of a cane on his RFC, which consultative examiner Dr. Schoen found to be medically necessary at least as of April 2018.  Whether plaintiff requires a cane may be significant because the vocational expert testified that the need for a cane eliminated the jobs available for a person restricted to occasional reaching.

* * * * *

For the foregoing reasons, the Court finds that the ALJ's decision is not supported by substantial evidence on the record as a whole.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **reversed** and this matter is **remanded** pursuant to the fourth sentence of 42 U.S.C. § 405(g) for further proceedings.

A separate Judgment shall accompany this Memorandum and Order.

/s/ *John M. Bodenhausen*
JOHN M. BODENHAUSEN
UNITED STATES MAGISTRATE JUDGE

Dated this 30th day of March, 2021.